UNITED STATES DISTRICT COURT
for the
DISTRICT OF MINNESOTA

City of Lake Elmo, a Minnesota municipal corporation,

                    Plaintiff,

vs.

3M Company, a Delaware corporation,

                    Defendant.

Case Number: 0:16-cv-2557

**COMPLAINT**

**Demand for Jury Trial**

---

Plaintiff, City of Lake Elmo ("City" or "Lake Elmo"), for its Complaint, states and alleges as follows:

## PARTIES

1.      The City is a Minnesota municipal corporation.  Its offices are located at 3800 Lavern Ave. N, Lake Elmo, Minnesota.

2.      Defendant, 3M Company ("3M" or "Company"), is a corporation organized under Delaware law and has its principal place of business in Maplewood, Minnesota.

## JURISDICTION

3.      This action arises under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601, *et seq.* ("CERCLA") and therefore this Court has jurisdiction under 42 U.S.C. § 9613 and 28 U.S.C. § 1331.

4.      This Court also has supplemental jurisdiction over the City's state law claims under 28 U.S.C. §1367.

5.      Venue is proper pursuant to 42 U.S.C. § 9613 and 28 U.S.C. § 1391.

**OVERVIEW**

6.      Beginning in approximately 1950, 3M produced perfluorochemicals ("PFCs") at its Cottage Grove facility in Minnesota.  3M used PFCs in consumer, commercial, and industrial products, such as stain repellents like Scotchgard™, fire retardants, stain removers, paints, hydraulic fluids, semi-conductors, and other chemical products.  It has also sold PFCs to other companies, such as DuPont, for use in their manufacturing processes.

7.      3M arranged for the disposal of PFCs and PFC-containing wastes at several disposal sites, including three dump sites at a disposal facility that it owned and operated in Oakdale, Minnesota ("Oakdale Facilities") and at the Washington County Landfill ("Landfill") located in Lake Elmo.

8.      Lake Elmo operates a municipal wellfield that draws from local groundwater aquifers to supply drinking water to its residents and businesses.

9.      PFCs have leached from the Oakdale Facilities and from the Landfill into groundwater and ultimately into the City's drinking water supply.

10.     The Environmental Protection Agency ("EPA") has issued health advisories for PFCs, warning that drinking water containing PFCs above certain levels poses a risk to human health.  Those risks include cancer, high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and increased risks to a developing fetus.

11.     PFCs are hazardous substances.  3M has stated on various of its hazardous waste manifests and elsewhere that PFCs are hazardous due to their waste characteristics of ignitability, corrosivity, and toxicity.

12.     After the City became aware that PFCs from the Oakdale Facilities and the Landfill contaminated one of its potential drinking water wells in concentrations that posed a risk to human

2

health, the City voluntarily took remedial measures and incurred substantial costs identifying, constructing, and utilizing an alternative source of drinking water.

13.     3M is liable under Section 107 of CERCLA for the costs and other damages incurred by the City to address contamination resulting from 3M's disposal of hazardous substances that contaminated the City's drinking water supply.

14.     3M is also liable under nuisance, trespass, Minn. Stat. § 103I.241, negligence, and conversion for the costs and other damages incurred by Lake Elmo to address contamination resulting from 3M's disposal of hazardous substances that contaminated the City's drinking water supply.

## FACTS

### PFCs

15.     PFCs are a family of manufactured chemicals in which fluorine atoms replace the hydrogen atoms that are normally attached to the carbon "backbone" of hydrocarbon molecules.

16.     PFCs include, without limitation, these chemicals and associated compounds:

- Perfluorooctooctonoic acid ("PFOA");

- Perfluorooctane sulfonate ("PFOS");

- Perfluorobutanoate ("perfluorobutyrate", "perfluorobutyric acid" or "PFBA");

- Perfluorobutane sulfonate ("nonafluorobutanesulphonic acid" or "PFBS");

- Perfluorohexane-1-sulphonic acid ("PFHxS");

- Perfluoro-n-pentanoic acid ("PFPeA"); and

- Perfluorohexanoic Acid ("PFHxA")

17.     PFOS and PFOA are no longer produced in the United States due to human health concerns associated with exposure to PFOS and PFOA.

18.     3M began conducting studies regarding the health impacts of PFCs in the mid-1970s, but did not share that information with applicable federal or state agencies until the late 1990s.

19.     In 1999, the EPA began to investigate PFCs and their potential human health effects.  In response, 3M submitted to the EPA data on PFOS that indicated that it was toxic in rats and persistent in the environment and in humans.  In 2000, 3M agreed to phase out the manufacture and use of PFOS and PFOA in its products.

20.     Humans do not metabolize PFCs nor does the human body excrete the longer chain compounds very rapidly; indeed, they can remain in the human body for four to eight years.

21.     Animal studies have shown that PFCs are readily absorbed orally and distributed mainly to the liver, where they are shown to be toxic.  Such studies have also shown that exposure to certain levels of PFCs can be acutely toxic to animals.

22.     Under the EPA's Guidelines of Carcinogen Risk Assessment (March 2005), the evidence for the carcinogenicity of PFOS and PFOA is considered "suggestive of carcinogenicity."

23.     A 2005 peer-reviewed EPA evaluation of a study of 3M employees at its Cottage Grove facility concluded that workers with 27 years of exposure in probable PFOA-exposed jobs or those with 9 years of definite PFOA exposure were 3.3 times more likely to die of cerebrovascular disease than the general population.

24.     PFOA also has been studied extensively by a panel of scientists.  Brookmar Inc., an independent company, conducted a year-long survey (August 2005 - July 2006) called the C8 Health Project. The C8 Health Project gathered information through interviews and questionnaires and collected blood samples from about 69,000 people living near the DuPont Washington Works plant in West Virginia.  A panel of scientists (the "C8 Science Panel"), consisting of three epidemiologists, were charged with evaluating whether there was a probable link between PFOA

4

exposure and any human disease.  As used by the C8 Science Panel, a "probable link" meant that, given the available scientific evidence, it was more likely than not that a connection existed between PFOA exposure and a particular human disease.

25.     Between 2011 and 2012, the C8 Science Panel concluded that there is a probable link between exposure to PFOA and the following health conditions:

- Testicular cancer;
- Kidney cancer;
- Thyroid disease;
- Ulcerative colitis
- High cholesterol; and
- Pregnancy-induced hypertension.

26.     A 2012 study published in the *Journal of the American Medical Association* concluded that elevated exposure to PFCs was associated with reduced immune response to routine childhood immunizations in children between the ages of 5 to 7.

27.     A 2014 published study jointly conducted by the National Institute of Child Health and Human Development and the Centers for Disease Control and Prevention concluded that elevated exposure to PFOA is associated with increased gestational diabetes risk.

28.     A 2015 study published by the European Society of Human Reproduction and Embryology linked women's exposure to PFOA and PFHxS to greater difficulties with becoming pregnant.

29.     In June 2016, a peer-review panel of epidemiologists, toxicologists, microbiologists and other scientists agreed with the U.S. Department of Human and Health Services National Toxicology Program's conclusion that PFOS and PFOA could harm the human immune system.

30.     The concentrations of PFOS and PFOA in drinking water above which federal and state agencies have determined to pose a human health risk have steadily decreased over time.

5

31.     In 2002, the Minnesota Department of Health ("MDH") set the Health Based Value ("HBV") for PFOA and PFOS at 7.0 parts per billion ("ppb") and 1.0 ppb, respectively. In March 2007, MDH lowered the HBVs for PFOA and PFOS to 0.5 ppb and 0.3 ppb, respectively.  As of 2013, MDH has set Health Risk Levels ("HRLs"), which are promulgated advisory values, for both PFOA and PFOS at 0.3 ppb.

32.     Regulatory agencies in other states have set the guidance levels for PFCs at levels lower than Minnesota. For example, Maine has set the Maximum Exposure Guideline for PFOA at 0.1 ppb, and New Jersey has set its guidance level for PFOA at 0.04 ppb.  Vermont set a Health Level for PFOA at 0.02 ppb.

33.     MDH has instituted a cumulative score called the "Hazard Index" that reflects whether the total amount of several chemicals in a sample represents a health risk.  Exceeding a Hazard Index of 1.0 for PFCs is equivalent to exceeding a HRL.  If either type of exceedance occurs at a private or municipal well, MDH issues a well-advisory letter in which MDH advises that the water is not safe for human consumption without treatment.

34.     In 2009, the EPA set provisional health advisories ("PHAs") for PFOA and PFOS at 0.4 ppb and 0.2 ppb, respectively.  A PHA reflects reasonable, health-based hazard concentrations above which action should be taken to reduce exposure to contaminants in drinking water.

35.     In May 2016, the EPA issued its updated Drinking Water Health Advisory and reduced the acceptable combined amount of PFOA and PFOS in drinking water to 0.07 ppb.  In its evaluation, the EPA concluded that "because a developing fetus changes rapidly and is vulnerable during various stages in development, a single exposure to PFOS at a critical time in development might produce an adverse effect.  PFOS is extremely persistent in both the human body and the environment; thus, even a short-term exposure results in a body burden that

persists for years and can increase with additional exposures."  It also concluded that there is suggestive evidence of carcinogenic potential of PFOA and PFOS in humans.

**3M's Manufacture and Disposal of PFCs**

36.     3M began research and development of PFCs in the late 1940s.

37.     The Company began commercial production of PFCs and products containing PFCs at its Cottage Grove facility in Minnesota in the early 1950s.

38.     Throughout its production and use of PFCs and related products, 3M disposed of PFC-containing waste products at several sites in Minnesota, including the Oakdale Facilities and the Landfill.

39.     The Oakdale Facilities consist of three, now closed, dump sites, known as the Abresch, Brockman, and Eberle sites, at which 3M and other companies disposed of industrial wastes during the late 1940s and the 1950s.  The largest site was the Abresch dump site, a 55-acre site located along State Highway 5 and west of Interstate 94.

40.     3M operated the Abresch dump site throughout its period of operation and has owned the site from the 1940s to the present.

41.     In the early 1950s, 3M began to dispose of wastes generated by 3M's production or use of PFCs at the Oakdale Facilities.

42.     At the Abresch site, 3M buried its wastes in trenches, no more than 15 feet deep. The majority of wastes disposed of in the Abresch site were placed on the ground surface and partially covered with soil.

43.     PFCs and PFC-containing wastes were disposed of at the Oakdale Facilities.  3M arranged for the disposal of some or all of those wastes.

44.     PFOA and PFOA-containing wastes were disposed of at the Oakdale Facilities. 3M arranged for the disposal of some or all of those wastes.

45. PFOS and PFOS-containing wastes were disposed of at the Oakdale Facilities. 3M arranged for the disposal of some or all of those wastes.

46. During the early 1970s, 3M disposed of wastes generated by 3M's production or use of PFCs at the Landfill.  The Landfill is a 25-acre site located south of Lake Jane near the intersection of Lake Jane Road & Jamaca Avenue.

47. PFCs and PFC-containing wastes were disposed of at the Landfill.  3M arranged for the disposal of some or all of those wastes.

48. PFOA and PFOA-containing wastes were disposed of at the Landfill.  3M arranged for the disposal of some or all of those wastes.

49. PFOS and PFOS-containing wastes were disposed of at the Landfill.  3M arranged for the disposal of some or all of those wastes.

**3M's Acknowledgement that PFCs are Hazardous to Human Health and the Environment**

50. Wastes that have characteristics of hazardous waste under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, *et seq.* ("RCRA") are hazardous substances under CERCLA, 42 U.S.C. § 9601(14).

51. In 1980, using its authority under RCRA, EPA required that 3M determine the hazardous nature and characteristics of each of its waste streams.  3M then produced to the EPA documents disclosing the required information.

52. After 1980, it became 3M's general practice to identify in waste shipping manifests all shipments of wastes that were hazardous wastes under RCRA and its regulations by using the applicable hazardous waste code identifiers, such as "D001" and "D002."

53. Consistent with that practice, 3M has identified PFOA-containing waste on hazardous waste shipment manifests as constituting Waste Code D001, which indicates that the waste exhibited the hazardous characteristic of ignitability under RCRA and its regulations.

54.     3M has also identified PFOA-containing waste on hazardous waste shipment manifests as constituting Waste Code D002, which indicates that the waste exhibited the hazardous characteristic of corrosivity under RCRA and its regulations.

55.     3M has also identified PFOA-containing waste on hazardous waste shipment manifests as constituting Waste Code D004, which indicates that the waste exhibited the hazardous characteristic of toxicity under RCRA and its regulations.

56.     3M has also identified PFCs and PFC-containing waste on hazardous waste shipment manifests as constituting Waste Codes D001, D002 and D004, which indicates that the PFCs and PFC-containing wastes exhibited the hazardous characteristics of ignitability, corrosivity and toxicity under RCRA and its regulations.  Those hazardous wastes include, but are not limited to, the wastes identified in Exhibit A to this complaint, which is a summary of the PFCs identified by 3M in hazardous waste manifests, waste stream profiles, material data safety sheets, and other documents produced by 3M in *State of Minnesota, et al. v. 3M Company*, No. 27-CV-10-28862, a lawsuit pending in Minnesota district court.

57.     3M's waste streams from its manufacturing processes that resulted in the deposit of PFCs and PFC-containing waste at the Oakdale Facilities in the 1950s had similar, if not identical, chemical characteristics with respect to ignitability, corrosivity and toxicity, as those terms are defined under RCRA, as did the waste streams from its manufacturing processes that generated the PFCs and PFC-containing wastes listed in Exhibit A.

58.     3M's waste streams from its manufacturing processes that resulted in the deposit of PFCs and PFC-containing waste at the Landfill in the 1970s had similar, if not identical, chemical characteristics with respect to ignitability, corrosivity and toxicity, as those terms are defined under RCRA, as did the waste streams from its manufacturing processes that generated the PFCs and PFC-containing wastes listed in Exhibit A.

**Discovery of the Broad Scope of PFC Contamination in the City's Drinking Water Supply**

59.     Even though MDH developed HBVs for PFOA and PFOS in 2002, the Minnesota Pollution Control Agency ("MPCA") did not have an accurate way of testing for the concentrations of those compounds in soil and groundwater until 2004.

60.     After accurate testing methods were developed, MPCA, in cooperation with MDH, began testing the soils, sediments and groundwater (including well water) in and around the Landfill and the Oakdale Facilities.

61.     In 2004, triggered by 3M's notification of its historic PFC disposal practices to the State of Minnesota, soil and groundwater investigations were conducted which detected the presence of PFCs, including PFOA and PFOS, at the Abresch Site and the Landfill.  The investigations also revealed that the PFCs had been escaping from the Abresch Site and the Landfill and entering groundwater aquifers that served as the drinking supply for public and private wells in Oakdale and Lake Elmo.

62.     The surface water migrating from both of those facilities into the City's groundwater aquifers also contained PFOA and PFOS at substantial levels.

63.     The route from the Abresch Site to Lake Elmo's drinking water aquifers involves transport by surface water and groundwater migration.  The water table at the Abresch Site is located between 0-20 feet below ground surface and the waste was buried no deeper than 20 feet below ground surface.  In the northern and eastern portions of the Abresch Site, where the groundwater is at or close to the ground surface, wetlands and surface waters are present and are directly connected to the groundwater.  The wetlands are drained by Raleigh Creek, which flows east-southeast into the Tablyn Park neighborhood of the City and then into the north end of Eagle Point Lake, also within the City.

64.    Eagle Point Lake is considered to be a "flow-through" lake, meaning that groundwater enters the lake at the north (upgradient) end of the lake, flows through the lake as surface water, and discharges at the south (downgradient) end of the lake returning to the groundwater.  Water within Eagle Point Lake also travels into Lake Elmo and Horseshoe Lake, both of which are within the City's boundaries.

65.    In March 2005, PFOS and PFOA were found in the municipal wells serving the City of Oakdale.  Oakdale's Well #5 contained PFOS above the HBV level of 1 ppb. Recognizing the risk to human health presented by these PFCs in Oakdale's drinking water supply, 3M announced in August 2005 that it would voluntarily pay for the installation of a carbon filter on Oakdale's #5 at a cost of approximately $1 million.   Similarly, when elevated levels of PFCs were discovered in private wells located on residential properties in Lake Elmo, 3M made financial contributions to Lake Elmo's efforts to connect those properties to the City's municipal water distribution system.

66.    The City had drilled Well #3 in 2002 in the southern portion of the City, near I-94 and County Road 13 (Inwood Avenue).  The City expected that, as the southern portion of the City along I-94 became more developed, a municipal water system fed by Well #3 would be built and utilized.  The City had therefore capped Well #3 with the intent of finishing its construction at a future time.

67.    In 2006, in its ongoing effort to determine the extent of the PFC contamination by 3M, MDH tested Well #3.  The MDH's test results indicated that the water supply that would serve Well #3 contained unsafe levels of numerous PFCs, including PFOA, PFOS, and PFBA.

68.    The PFC levels in Well #3 exceeded the levels at which MDH will advise the public that the tested water is not safe for human consumption without treatment.

69.     Between 2006 and 2011, over 100 samples obtained by the State of private and municipal wells in Lake Elmo exceeded the Hazard Index of 1.0.  The exceedances ranged from slightly over the Hazard Index to over sixteen times higher than the Hazard Index.

**The City's Consideration of Alternatives to PFC-Contaminated Well #3**

70.     After learning of the PFC contamination in Well #3 and the numerous other private and public wells in Lake Elmo and Oakdale, the City determined that it might be necessary to pursue other avenues to provide safe drinking water.

71.     On August 29, 2008, the United States Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry ("Agency"), issued a report titled Perflurochemical Contamination in Lake Elmo and Oakdale, Washington County, Minnesota ("Oakdale/Lake Elmo PFC Report").  In the report, the Agency evaluated the amount of PFCs present at the Oakdale Facilities and the Landfill, the location where PFCs were found, and how people might be exposed to the PFCs.  The Oakdale/Lake Elmo PFC Report further evaluated the health effects of the PFC exposure on the impacted communities of Oakdale and Lake Elmo.  The Oakdale/Lake Elmo PFC Report includes analysis of the extent of the PFC plumes in the Lake Elmo and Oakdale area and confirmed that, as of 2008, the PFOA, PFOS and PFBA plumes extended into aquifers from which Well #3, if operational, would draw its water.

72.     The Agency finalized the Oakdale/Lake Elmo PFC Report only after receiving significant community input, including from 3M, which provided 15 pages of comments on the Agency's draft report.  In its final report, the Agency recommended that "[f]urther extensions of the Lake Elmo municipal water supply to serve areas where private wells contain levels of PFCs in excess of MDH HRLs or HBVs should be considered."

73.     In 2009, the City's consulting engineering firm, TKDA, issued the 2030 Comprehensive Water System Plan, Lake Elmo, Minnesota (the "2030 Water Plan").  TKDA considered various alternatives to address the City's water needs.  Because of the on-going presence of PFC contamination in Well #3 and in aquifers that are the source of the City's drinking water, the 2030 Water Plan includes an alternative water supply system that involved the construction of a new well in the northeast part of the City that would convey water by new trunk lines to the southern portion of the City (the "Alternative Water Supply System").

74.     Before making its final decision to construct the Alternative Water Supply System, the City held numerous public meetings, at which members of the public had the opportunity to comment on the 2030 Water Plan.  The City also met with both MDH and 3M representatives to discuss the City's options.

75.     The projects that make up the City's Alternative Water Supply System are now mostly complete and have cost millions of dollars.

76.     Because it was not able to use Well #3 to serve development in the southern part of the City, the City also has had to extend its contracts with the City of Oakdale for continued purchase of water through an interconnection point at the southern part of the City.  The City has paid hundreds of thousands of dollars in water purchase payments and connection fees to the City of Oakdale and continues to incur such costs.

## COUNT ONE
### CERCLA § 107

77.     The City incorporates by reference the allegations in paragraphs 1-76 as if fully restated here.

78.     The City is a "person" as that term is defined within the meaning of CERCLA, 42 U.S.C. §§ 9601(21) and 9607(a)(4)(B).

79.   3M arranged for the disposal of PFCs and PFC-containing waste at the Oakdale Facilities and Landfill.

80.   The PFCs and PFC-containing waste that 3M arranged for disposal of at the Oakdale Facilities and the Landfill are "hazardous substances" under CERCLA, 42 U.S.C. § 9601(14).

81.   The definition of "hazardous substances" under 42 U.S.C. § 9601(14) of CERCLA includes "hazardous wastes" under Section 3001 of the Solid Waste Disposal Act, 42 U.S.C. § 6921.

82.   The PFCs and PFC-containing waste that 3M arranged for disposal of at the Oakdale Facilities and at the Landfill are "hazardous wastes" under Section 3001 of the Solid Waste Disposal Act, 42 U.S.C. § 6921.

83.   Specifically, the PFCs and PFC-containing waste are hazardous wastes having one or more of the characteristics of ignitability, corrosivity and toxicity, as those characteristics are defined under section 3001 of the Solid Waste Disposal Act, 42 U.S.C. § 6921.

84.   3M has listed on waste manifests and other documents that PFC-containing waste streams were hazardous wastes due to their having one or more of the characteristics of ignitability, corrosivity and toxicity, as those characteristics are defined under section 3001 of the Solid Waste Disposal Act, 42 U.S.C. § 6921.

85.   The Oakdale Facilities and the Landfill each constitute a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

86.   3M both owned and operated the Oakdale Facilities at the time that PFCs and PFC-containing waste were disposed of.

87.   3M, at the time of the disposal of PFCs, owned and operated a "facility", as that term is defined under 42 U.S.C. § 9601(9), at which the PFCs were disposed.

88.     As provided under 42 U.S.C. § 9607(a)(3), 3M, by contract, agreement, or otherwise, arranged for disposal or treatment of hazardous substances owned or possessed by 3M at a facility.

89.     3M has released PFCs into the environment, within the meaning of the terms "release" and "environment" as those terms are defined in CERCLA, 42 U.S.C. §§ 9601(22) and 9601(8).  Those releases include releases of PFCs from the Oakdale Facilities and from the Landfill.

90.     Such releases include, but are not limited to, PFCs discharged by leaching, surface water discharge or other manner into groundwater aquifers that serve as a source for the City's drinking water supply.

91.     The PFCs that have been released or are threatened to be released into the City's drinking water supplies are "hazardous substances" as that term is defined by CERCLA, 42 U.S.C. § 9601(14).

92.     Specifically, the PFCs are a hazardous waste having one or more of the characteristics of ignitability, corrosivity and toxicity, as those characteristics are defined under section 3001 of the Solid Waste Disposal Act, 42 U.S.C. § 6921.

93.     As a result of the release or threatened release of PFCs into the City's drinking water supply, the City has incurred and will continue to incur necessary response costs under 42 U.S.C. § 9607(a)(4)(B), including without limitation, costs associated with providing an alternative water supply to the businesses and residents of the City.

94.     The City's necessary response costs are consistent with the requirements of the national contingency plan.

95.     Under CERCLA, 42 U.S.C. § 9607, 3M is strictly liable for the past, present and future costs incurred by the City in responding to the release or threatened release of PFCs into the City's drinking water supply.

<b>COUNT TWO</b><br><b>COMMOM LAW AND STATUTORY NUISANCE</b>

96.     The City incorporates by reference the allegations in paragraphs 1-76 as if fully restated here.

97.     The City is the owner of Well #3 and other properties within the municipal boundaries of the City.

98.     The City has the legal right to use and enjoy its property, which includes the right to withdraw groundwater allocated to it by permit from the Minnesota Department to Natural Resources for municipal water supplies.

99.     The release and invasion of 3M's PFCs into the aquifers that serve the City's well and onto the City's property has materially and substantially interfered with its ability to use and enjoy its property.

100.    3M knew, or should have known, at the time of the disposal that its placing of this hazardous waste in the Oakdale Facilities and the Landfill would cause substantial injury to the City's property, materially interfere with the City's legal rights to use and enjoy its property, and be harmful to humans or offensive to the senses.

101.    3M intentionally or negligently allowed the PFCs to be released and escape from the Oakdale Facilities and the Landfill and invade upon the City's property, infringing upon the City's rights.

102.    3M's conduct constitutes a violation of the City's common law right to have the use and enjoyment of its property free from nuisances causes by 3M.

103.    Minn. Stat. § 561.01 (2010) provides that: "[a]nything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance. An action may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well as damages recovered."

104.    3M's conduct constitutes a violation of Minn. Stat. § 561.01, as its release of PFCs into the groundwater aquifers from which the City has the right to draw its municipal drinking water is injurious to health, and indecent and offensive to the senses, and an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of its property.

105.    3M's disposal of hazardous substances and the continuing invasion of those substances in its drinking water supplies and onto its property have directly and proximately caused the City to be denied its right to use its drinking water and to comfortably enjoy its property.

106.    3M intentionally caused this nuisance because it refused to change the conditions causing the nuisance even after being advised by the City and various state agencies of the effect that its actions were having on Lake Elmo's ability to use and enjoy its drinking water supply and property.

107.    The City has been damaged, and will continue to be damaged, by 3M's nuisance in an amount to be proven at trial.

**COUNT THREE**
**COMMON LAW TRESPASS**

108.    The City incorporates by reference the allegations in paragraphs 1-76 as if fully restated here.

109.    The City has the legal right to use and enjoy its property, which includes the right to withdraw groundwater allocated to it by permit from the Minnesota Department to Natural Resources for municipal drinking water supplies.

110.    The City is the rightful owner, and is the rightful party in possession, of its property and its municipal water wells.

111.    3M unlawfully trespassed upon the City's property by contaminating it with PFCs and thereby preventing the City from using the groundwater within the aquifer that flows underneath its property.

112.    The City has suffered damages, and will continue to suffer damages, as a direct and proximate result of 3M's trespass, the amount of which will be proved at trial.

## COUNT FOUR
## LIABILITY PURSUANT TO MINN. STAT. § 103I.241

113.    The City incorporates by reference the allegations in paragraphs 1-76 as if fully restated here.

114.    The City is the owner of the well that is the subject of this action and the real property upon which it is located.

115.    3M disposed of certain hazardous waste, which ultimately contaminated the well owned by the City.

116.    The City has been damaged, and will continue to be damaged, by 3M's contamination of the City's well in an amount to be proven at trial.

117.    Pursuant to Minn. Stat. § 103I.241, 3M is liable to the City not only for its damages, but also for its reasonable attorneys' fees, costs and disbursements.

## COUNT FIVE
## NEGLIGENCE

118.     The City incorporates by reference the allegations in paragraphs 1-76 as if fully restated here.

119.     3M had a duty to act reasonably and responsibly with regard to the disposal of its PFCs in a manner that would protect the City from reasonably foreseeable harm.

120.     3M breached this duty when it chose to dispose of this hazardous waste in the Oakdale Facilities and the Landfill in a manner that failed to prevent the PFCs from leaching and otherwise being released into the aquifers that serve as the City's drinking water supply.

121.     3M's breach of this duty was the direct and proximate cause of the injuries to the City's property and resultant damages.

122.     The City has suffered, and will continue to suffer, damages because of 3M's negligence, the amount of which will be proven at trial.

## COUNT SIX
## CONVERSION

123.     The City incorporates by reference the allegations in paragraphs 1-76 as if fully restated here.

124.     3M's improper disposal of hazardous waste and subsequent contamination of the City's municipal well and the water has caused an intrusion upon, changes to, damage to, and destruction of the City's property interest therein, and has deprived the City of the possession, control, and use of its property interest.

125.     3M's conduct constitutes conversion of the City's personal property interest in its municipal well and the water therein.

126.    The City has suffered, and will continue to suffer, damages because of 3M's conversion, the amount of which will be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the City prays for relief as follows:

1.    A declaration that 3M is liable under CERCLA for the City's necessary response costs arising from the release of hazardous substances into the City's drinking water supply.

2.    A declaration under CERCLA requiring 3M to make a prospective payment of the City's ongoing response costs.

3.    A declaration that the release of PFCs into the City's drinking water supply constitutes a nuisance.

4.    A declaration that the release of PFCs into the City's drinking water supply constitutes a trespass.

5.    A declaration that 3M's disposal of its PFCs resulted in the contamination of the City's well.

6.    An order directing 3M to pay for:

    a.    all of the City's current and future response costs under CERCLA;

    b.    all of the City's damages and injuries that were directly or proximately caused by 3M's conduct;

    c.    pre-judgment interest on all damages incurred;

    d.    the City's costs and disbursements; and

    e.    the City's reasonable attorneys' fees pursuant to Minn. Stat. § 103I.241 and all other applicable authority.

7.    Any other legal or equitable relief this Court deems just and appropriate.

Dated:  July 28, 2016                    KENNEDY & GRAVEN, CHARTERED


By: /s/ James J. Thomson
     James J. Thomson (#145300)
     Douglas D. Shaftel (#391985)
     470 U.S. Bank Plaza
     200 South Sixth Street
     Minneapolis, MN 55402
     (612) 337-9300

and

PRETI, FLAHERTY, BELIVEAU & PACHIOS,
CHARTERED, LLP

     Jeffery Talbert (*pro hac vice* pending)
     (Maine #004358)
     E. Michael Thomas (*pro hac vice* pending)
     (Massachusetts #496110)
     One City Center
     P.O. Box 6546
     Portland, ME 04112
     (207) 791-3000

ATTORNEYS FOR PLAINTIFF
CITY OF LAKE ELMO